**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
DELTA DIVISION**

CHRISTOPHER MARZETT REED                                    PLAINTIFF

V.                               No. 2:18-CV-00105-JM-JTR

NWANNEM OBI-OKOYE, M.D.,
Health Services Unit,
Forrest City Medium, *et al.*                              DEFENDANTS

## RECOMMENDED DISPOSITION

The following Recommended Disposition ("Recommendation") has been sent

to United States District Judge James M. Moody, Jr. You may file written objections

to all or part of this Recommendation. If you do so, those objections must: (1)

specifically explain the factual and/or legal basis for your objection; and (2) be

received by the Clerk of this Court within fourteen (14) days of this

Recommendation. By not objecting, you may waive the right to appeal questions of

fact.

## I. Introduction

Plaintiff Christopher Marzett Reed ("Reed"), formerly a prisoner in the

Federal Bureau of Prisons ("BOP"),[1] filed this *pro se* action alleging that eighteen

---

[1]Reed now resides in Memphis, Tennessee.

named Defendants[2] and an unspecified number of "Doe Defendants" provided inadequate medical care and racially discriminated against him while he was a prisoner in the Federal Correctional Institution-Medium located in Forrest City, Arkansas ("FCI-FC"). *Doc. 2.*

Reed alleges that between 2014 and 2017, he suffered from a skin condition that was improperly diagnosed and inadequately treated by both medical personnel in the FCI-FC Health Services Unit, and a BOP dermatologist who assessed and treated him remotely by "teledermatology." During this time, the rash spread to Reed's chest, groin, abdomen, legs and arms, developing into painful, pus-filled lesions and open sores. *Doc. 2 at 3, 11-19.* He alleges he eventually received proper treatment from an "outside" dermatologist. However, FCI-FC medical staff later refused to provide the medication prescribed by the dermatologist, which caused the rash to spread into his ears, throat and eyes. *Id. at 13, 19-20.*

Reed alleges that, through the BOP's administrative grievance process, supervisors knew about the inadequate medical care provided to him by staff medical providers, but failed and refused to take any corrective action. *Id. at 23-27, 53-55, 58-67.*

---

[2]Reed originally brought this action against Jennifer Petro; John Hardin; Nwannem Obi-Okoye; Andrew Manos; J. Capps; Patricia Morehart; J. Harris; M. Hickerson; Sheila Woodard; B. Hoy; Gene Beasley; James E. Robinson; J.F. Caraway; Jason Sickler; B.K. Victor; Ian Connors; Federal Bureau of Prisons; and the United States of America. *Doc. 2 at 1-2.*

Reed alleges Defendants' inadequate medical care was "invidiously, racially motivated" because he is black. He alleges that similarly situated non-black inmates timely received outside medical specialist appointments and the medications prescribed by the specialists.[3] *Id. at 7-9, 14-15, 49, 51-52 & 70.*

Reed alleges his unconstitutional care resulted in permanent scars covering his entire body. *Id. at 97-98.* He seeks $10 million in compensatory and punitive damages for permanent physical scarring, loss of vision, humiliation, and emotional and psychological trauma. *Id. at 14-15, 70.*

### A.    Claims

After screening Reed's Complaint, identifying "Doe Defendants," and addressing Motions to Dismiss, Reed is currently pursuing:

1. *Bivens*[4] claims for:

    (a) inadequate medical care claim provided by Defendant Andrew Manos, P.A. ("Manos");

---

[3]Reed broadly alleges that a "racially hostile climate" pervades the BOP and that its administration "promotes and thus condones inmate racial segregation and the continual reliance upon Criminal Organizations to control the inmate populace through intimidation and violence." *Id. at 10 & 64.* He seeks appointment of a special master to investigate racial discrimination throughout the BOP, including segregation in the common areas and in cell assignments, and the BOP's alleged encouragement of inmates to join racially segregated gangs. *Id. at 10, 22, 26, 62-66, 68, 70, 76-78, 81-82.*

[4]In *Bivens v. Six Unknown Agents of Fed. Bureau of Narcotics,* 403 U.S. 388 (1971), the Court held that plaintiffs may recover damages when their federal constitutional rights are violated by federal employees, just as 42 U.S.C. § 1983 provides redress for constitutional violations by state officials.

(b) inadequate medical care claim provided by Defendants Nwannem Obi-Okoye, M.D. ("Dr. Obi-Okoye"), and Shelia Woodard, M.D. ("Dr. Woodard");

(c) inadequate medical care and a corrective inaction claim against separate Defendants Jillian Harris ("Harris"), Michelle Hickerson ("Hickerson), Patricia Morehart ("Morehart"), and Brenda Hoy ("Hoy") ("BOP Defendants").

2.  A Federal Tort Claims Act ("FTCA") claim for medical negligence against Defendant United States of America ("USA").

3.  The Arkansas Civil Rights Act ("ACRA"), along with counterpart claims under 42 U.S.C. §§ 1981, 1985, and 1986 for racial discrimination and violations of equal protection against Dr. Obi-Okoye, Dr. Woodard, Manos, Morehart, Harris, Hickerson, Hoy, James Robinson ("Robinson"), Gene Beasley ("Beasley"), J.F. Caraway ("Caraway"), and Ian Connors ("Conners"),[5] *Docs. 10, 14, 37, 39, 54, 57, 60, 62, & 69.*[6]

## B.    Pending Motions for Summary Judgment[7]

Defendant Manos has filed a Motion for Summary Judgment, Amended Motion, Statement of Undisputed Facts, and Brief in Support arguing that Reed's

---

[5] The Court previously granted a Motion to Dismiss *Bivens* claims against Defendants Robinson, Beasley, Caraway, and Connors. *Docs. 37, 60, 62.* In dismissing those *Bivens* claims, the Court noted that the Motion to Dismiss did *not* address Reed's ACRA and 42 U.S.C. §§ 1981, 1985 and 1986 claims. Accordingly, Reed's claims alleging race discrimination and equal protection violations were allowed to proceed to the extent they were legally and factually related to Reed's inadequate medical care and corrective inaction claims. *Doc. 60 at 17.*

The Court dismissed all of Reed's other claims. *Doc. 14.*

[6] Reed's racial discrimination, and equal protection claims are predicated on his claim that he did not receive constitutionally adequate medical care from the Defendants. Because the Court concludes all of Reed's inadequate medical care claims are without merit, his pending race discrimination and equal protection claims, against all Defendants should also be DISMISSED, with prejudice.

[7] Summary judgment is appropriate when the record, viewed in a light most favorable to the nonmoving party, demonstrates that there is no genuine dispute as to any material fact, and the

claim of medical deliberate indifference should be dismissed. *Docs. 73, 74, 75 & 76.* Reed filed a Response and Manos filed a Reply. *Docs. 78 & 87.*

Separate Defendants Dr. Obi-Okoye and Dr. Woodard have filed a Motion for Summary Judgment, Brief in Support, Statement of Undisputed Facts, and Amended Statement of Undisputed Facts arguing that Reed's claim of medical deliberate indifference should be dismissed. *Docs. 79, 80, 81 & 83.* Reed did not file a Response.

Defendant United States and BOP Defendants Harris, Hickerson, Morehart, and Hoy have filed a Motion for Summary Judgment, Statement of Undisputed Facts, and Brief in Support arguing that Reed's claims of medical deliberate indifference and negligent medical care should be dismissed. *Docs. 84, 85, & 86.* Reed did not file a Response.

Because Reed was unable to provide a current address for Defendant Dr. J. Capps, he never served.[8]

---

moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby Inc*., 477 U.S. 242, 249-50 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. Once that has been done, the nonmoving party must present specific facts demonstrating that there is a material dispute for trial. *See* Fed R. Civ. P. 56(c); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).

[8] The Court initially attempted to served "Dr. Capps" at both FCI-FC (where he no longer works) and at his last-known mailing address. Thereafter, the Court cautioned Reed that failure to file an adequate Motion for Service would result in dismissal of Dr. Capps, without prejudice. *Doc. 70*. Reed has never provided the Court with any further information on how to serve Dr. Capps.

For the reasons explained below, the Court recommends that all of Defendants' separate Motions for Summary Judgment be GRANTED and that all of Reed's claims against Defendants Manos, Dr. Obi-Okoye, Dr. Woodard, the United States, Harris, Hickerson, Morehart and Hoy be dismissed, with prejudice.

Because Reed has not provided the Court with a Motion for Service containing Defendant Dr. J. Capps' proper service address, as explained to Reed in the Order dated December 10, 2020 *(Doc. 70)*, Reed's claims against Dr. Capps should be dismissed, without prejudice.

Finally, because the undisputed facts demonstrate that Reed received constitutionally adequate medical care, his racial discrimination and equal protection claims against all Defendants under 42 U.S.C. §§ 1981, 1985, and 1986, and ACRA, should be DISMISSED, without prejudice.

## II. Discussion

Before reaching the merits of Defendants' Motions for Summary Judgment, the Court will review the relevant undisputed facts giving rise to Reed's claims. The Court gave Reed an opportunity to Respond to the Motions for Summary Judgment and Statements of Undisputed Facts. *Doc. 88.* The Court informed Reed that, at the summary judgment stage, he could not rest upon his allegations and must now meet proof with proof. *Doc. 88 at 1-2.* Finally, the Court cautioned Reed that, under Local

6

Rule 56.1, he was obligated to respond to Defendants' Statements of Undisputed

Facts if he disagreed with any of Defendants' statements:

> [F]ailure to timely and properly file a Response and
> Statement of Disputed Facts to a Motion for Summary
> Judgment will result in: (a) all of the facts in the applicable
> Defendants' Statement of Undisputed Facts being deemed
> undisputed by Plaintiff; and (b) the possible dismissal of
> this action, without prejudice, pursuant to Local Rule
> 5.5(c)(2).

*Doc. 88 at 1-2.*

Reed did not file a Statement of Disputed Facts contesting anything contained

in Defendants' Statement of Undisputed Facts.[9] Accordingly, all of the facts recited

in Defendants' Statement of Undisputed Facts are now deemed to be *undisputed* and

the Court can accept those facts as true.

### A.    Undisputed Material Facts

1.    Reed arrived at the FCI-FC on October 24, 2013. During his

incarceration at FCI-FC, Reed was treated by a number of health professionals,

including a BOP dermatologist and an outside dermatologist in Memphis. *Doc. 83*

*at ¶3.*

2.    During his initial health screening on October 29, 2013, Reed had a

prurient rash on his face and back. Reed estimated he had this rash for two weeks.

---

[9] He also only filed a Response to Manos' Motion for Summary Judgment. *Doc. 78.*

*Doc. 85 at ¶¶1-2.* Medical notes documented a scar on Reed's back and 1mm lesions on his upper lip, cheeks, and upper back. *Doc. 85-1 at 31.* Nondefendant Kathleen Maples, APN, prescribed doxycycline monohydrate for an unspecified local infection of the skin and substations tissue. *Doc. 85-1 at 32.*

3.      On October 30, 2013, Dr. Obi-Okoye evaluated Reed at his 14 day post-intake medical evaluation. The evaluation focused on Reed's sleep apnea and obesity. *Doc. 83 at ¶4.*

4.      On November 15, 2013, Reed was seen in health services for a rash on his right foot. A nondefendant provider noted a small open area on Reed's right foot, prescribed clotrimazole cream, and advised Reed to return if the problem worsened. *Doc. 85 at ¶3; Doc. 85-1 at 35-36.*

5.      On January 7, 2014, Reed returned to health services complaining of a foot rash with open sores that had not healed. He was prescribed miconazole cream and provided gauze to wrap the affected area to aid healing. *Doc. 85 at ¶5; Doc. 85-1 at 39-40.*

6.      Read returned to health services on January 27, 2014. The rash had spread and he was suffering abscesses. A nondefendant provider diagnosed cellulitis and prescribed clindamycin HLC. *Doc. 85 at ¶5; Doc. 85-1 at 43-44.*

7.      On February 6, 2014, Reed returned to health services and complained that his foot infection was not improving after taking the prescribed antibiotics. A

provider noted temporarily acute, worsening skin condition, prescribed doxycycline monohydrate, and administered an injection of ceftriaxone. *Doc. 85 at ¶6; Doc. 85-1 at 49-52.*

8.     On February 27, 2014, Reed returned to health services for follow-up. After finishing all of his prescribed antibiotics, his foot seemed to be getting worse. A provider requested a dermatology consultation for a persistent fungal infection, with cellulitis, that had failed to improve after treatment with multiple prescriptions. The provider advised Reed to return immediately if his condition worsened. *Doc. 85 at ¶7; Doc. 85-1 at 54-56.*

9.     On March 5, 2014, Reed saw BOP dermatologist John Hardin, M.D., through a teledermatology consult. Dr. Hardin diagnosed Reed with eczematous dermatitis, prescribed betamethasone dipropionate ointment, informed health services this is a recurrent condition that will require intermittent treatment, and advised Reed to seek a re-consult if the condition did not abate within three to four weeks. *Doc. 85 at ¶8; Doc. 85-1 at 58.*

10.     On March 11, 2014, the BOP's Utilization Review Committee approved Reed for evaluation by an "outside" dermatologist. *Doc. 2 at 100.*

11.     On April 22, 2014, Reed was seen in health services for a cold. He reported his feet were much better, but he still had a small area of red, irritated skin.

A provider renewed Reed's betamethasone ointment prescription. *Doc. 85 at ¶9; Doc. 85-1 at 62-66.*

12.    On May 15, 2014, Reed returned to health services with a painful rash to his groin that had been present for three days. The provider diagnosed candidiasis and prescribed fluconazole and nystatin cream. *Doc. 85 at ¶10; Doc. 85-1 at 68-69.*

13.    Reed returned to health services on June 24, July 7, and September 25, 2014, for renewal of his prescribed fluconazole, betamethasone ointment, and nystatin cream. *Doc. 85 at ¶11; Doc. 85-1 at 72-76.*

14.    On December 2, 2014, Dr. Obi-Okoye evaluated Reed, during a Chronic Care visit, and reviewed Reed's lab results and medications. He renewed Reed's medication, including an order for Nystatin cream to treat his foot rash. *Doc. 83 at ¶5; Doc. 85-1 at 79.*

15.    On December 8, 2014, Dr. Obi-Okoye discontinued nystatin cream and ordered clotrimazole cream for Reed's rash. *Doc. 83 at ¶6; Doc. 85-1 at 79.*

16.    On February 9, 2015, Reed was seen in health services and a provider renewed his betamethasone prescription. *Doc. 85 at ¶12; Doc. 85-2 at 2-4.*

17.    Reed was seen by health services on May 20, 2015. A physical examination revealed Reed had a small open wound of the upper left armpit. The wound was clear and dry with no signs of infection. *Doc. 85 at ¶13; Doc. 85-2 at 7-8.* Manos reviewed and signed off on the evaluation. *Doc. 75 at 1.* The diagnosis

was temporary/acute hidradenitis. Reed was advised to follow-up as needed and return immediately if his condition worsened. Manos prescribed Cephalexin 500 mg for seven (7) days. *Doc. 75 at 2.*

18.     On June 17, 2015, Manos treated Reed during a Sick Call/Triage encounter. During this visit, Reed complained of multiple skin "sores." He reported having intermittent rashes on his legs and trunk for many years, with past treatment using "hydrocortisone 10" and betamethasone. *Doc. 75 at 2.*

19.     Manos performed a physical examination and noted Reed had various plaques to his chest, trunk, and legs at varying stages of healing. Some plaques had overlying excretions with surrounding erythema, some were hyperpigmented without erythema. *Doc. 75 at 2.* Manos diagnosed Reed with chronic and recurring dermatitis/eczema, proscribed triamcinolone for fourteen days and betamethasone for thirty days, instructed Reed to return to Sick Call/Triage if his condition did not improve, and advised Reed to follow up with teledermatology in six weeks for further treatment. *Doc. 75 at 2-3; Doc. 85-2 at 11-13.* This June 17, 2015, encounter was the only time Manos directly examined and treated Reed. *Doc. 75 at 3.*

20.     On July 29, 2015, Reed returned for a follow-up for his rash. He noted he the had the rash for 15 years. Medications helped temporarily, but the rash persisted. A provider prescribed ketoconazole shampoo and instructed Reed to keep

11

his clothing and bedding washed, try to stop scratching, use ice and cold showers, and keep area clean and dry. *Doc. 85 at ¶15; Doc. 85-2 at 16-17.*

21.     On August 19, 2015, Reed returned for a follow-up. The ketoconazole shampoo had no effect and the provider noted Reed would need a teledermatology consultation. *Doc. 85 at ¶16; Doc. 85-2 at 21-22.*

22.     Reed returned for follow-up on September 16, 2015. Records note teledermatology was consulted and advised health services to treat with triamcinolone cream. *Doc. 85 at ¶17; Doc. 85-2 at 25-26.*

23.     On October 1, 2015, Reed saw Dr. Hardin for another teledermatology consultation. Dr. Hardin recommended treatment with betamethasone and use of daily Dove soap and moisturizer. *Doc. 85 at ¶18; Doc. 85-2 at 29-30.* On October 6, 2015, health services implemented Dr. Hardin's recommendation. *Doc. 85 at ¶19; Doc. 85-2 at 33.*

24.     On December 2, 2015, Reed saw Morehart with continuing chronic eczema. Morehart noted that the rash had persisted for years and would likely never completely resolve. He told Reed it would require intermittent treatment. *Doc. 85 at ¶20; Doc. 85-2 at 36-39.*

25.     Reed saw Morehart again on January 20, 2016. His rash was covering most of his body and the betamethasone was not working as it had in the past. Some

12

wounds appeared infected from scratching. Morehart submitted a new dermatology consultation and prescribed doxycycline. *Doc. 85 at ¶21; Doc. 85-2 at 41-44.*

26.     On February 2, 2016, Reed saw Morehart again. He had not picked up his prescribed doxycycline. Morehart renewed the prescription. *Doc. 85 at ¶22; Doc. 85-2 at 46-48.*

27.     Morehart discontinued the prescribed doxycycline on February 16, 2016, after a staff nurse reported a pill line noncompliance by Reed. *Doc. 85 at ¶23; Doc. 85-2 at 50.* On February 29, 2016, Morehart renewed Reed's betamethasone and noted counseling for pill line noncompliance. *Doc. 85 at ¶24; Doc. 85-2 at 52.*

28.     On March 8, 2016, Reed saw Dr. Hardin for another teledermatology consultation. Dr. Hardin noted crusted lesions on waistline and pruritus on the arms. Betamethasone was not working. Dr. Hardin again diagnosed eczematous dermatitis. He ordered an injection of Kenalog and prescriptions for loratadine and doxepin. Dr. Hardin again advised daily use of Dove soap and moisturizer. *Doc. 85 at ¶¶25-26; Doc. 85-2 at 54.*

29.     On June 6, 2016, Reed saw Morehart for chronic care follow up. Reed's rash cleared up for about a month after the Kenalog injection. Reed requested and received another injection. Morehart noted she would refer Reed to teledermatology if the Kenalog injection did not improve Reed's condition. *Doc. 85 at ¶27; Doc. 85-2 at 70-79.*

30.    On June 29, 2016, Reed saw Morehart for chronic care follow up. Reed still had chronic rash with crusted lesions. Morehart took a biopsy of the rash, ordered a diphenhydramine injection and doxycycline monohydrate, and continued triamcinolone acetonide and doxepin. *Doc. 85 at ¶28; Doc. 85-2 at 83-88.*

31.    The biopsy indicated psoriasiform dermatitis, "most consistent with chronic eczematous dermatitis." *Doc. 85 at ¶28; Doc. 85-2 at 91.* Dr. Woodard reviewed and co-signed the orders and reviewed the biopsy results. *Doc. 83 at ¶8.*

32.    On July 11, 2016, Reed saw Morehart for sick call with severe rash on all extremities and torso. Morehart ordered re-consultation with BOP teledermatology, prescription betamethasone cream, and injections of Kenalog and Benadryl IM "now." *Doc. 85 at ¶27; Doc. 85-2 at 94-98.*

33.    The next day, July 12, 2016, Reed saw Dr. Hardin for another teledermatology consultation. Dr. Hardin noted the clinical and pathology findings of eczematous dermatitis/allergic contact dermatitis. He noted repeated injections and recommended discontinuation of further injections. Dr. Hardin ordered betamethasone dipropionate, coal tar shampoo, and desonide cream. He advised Reed not to use any other products on the skin. *Doc. 85 at ¶31; Doc. 85-2 at 104.*

34.    On July 25, 2016, Reed saw Dr. Capps and requested an outside doctor's opinion. On August 1, 2016, Reed saw Morehart and again requested an

outside consultation. Morehart noted that when Reed adhered to his treatment regimen and his rash greatly improved. *Doc. 85 at ¶¶33-36; Doc. 85-2 at 109-118.*

35.    On November 15, 2016, Reed saw Morehart and Morehart again noted that when Reed adhered to his treatment regimen, his rash greatly improved. Reed was "pleased to know" he had an outside dermatologist consult pending in the near future. *Doc. 85 at ¶37; Doc. 85-2 at 125.*

36.    On January 3, 2017, Reed was sent out for a dermatology consultation, but was not seen by the doctor and his appointment was rescheduled. *Doc. 85 at ¶39; Doc. 85-3 at 11.*

37.    On January 19, 2017, Reed saw Morehart, who noted Reed had several open lesions. Morehart ordered antibiotics, and noted the outside dermatology office was closed when Reed arrived for his appointment and he was supposed to be rescheduled. *Doc. 85 at ¶41; Doc. 85-3 at 16-20.*

38.    On January 24, 2017, Morehart noted culture of Reed's open lesions indicated staph resistant to doxycycline. Morehart replaced doxycycline with clindamycin and rifampin. *Doc. 85 at ¶42; Doc. 85-3 at 22-25.*

39.    On February 16, 2017, Reed went to health services with pustules scattered all over his trunk, back, arms, legs, and face. The provider counseled Reed about the importance of taking all doses of his antibiotic. *Doc. 85 at ¶43; Doc. 85-3 at 27-28.*

40.    Reed followed up with Morehart on February 23, 2017. Morehart noted the outside dermatology appointment was now rescheduled. Morehart ordered amoxicillin, desonide, and doxepin. Morehart noted Reed was "consistently non-compliant" with treatment and had been non-compliant with antibiotics. Morehart suspected Reed was resistant to steroid cream and non-compliant with all other treatment. *Doc. 85 at ¶44; Doc. 85-3 at 31-37.*

41.    On March 9, 2017, Reed saw Dr. Hardin for another teledermatology consultation. Dr. Hardin ordered Reed to use Dove sensitive skin products and "absolutely no other products." Dr. Hardin noted preventing exposure to all potential irritants would require hard work from Reed. Dr. Hardin increased doxepin dosage and ordered betamethasone (to alternate with tacrolimus use on weekends). Dr. Hardin noted that if this treatment regimen is not helping in three months, he would consider an immunosuppressive agent. *Doc. 85 at ¶46; Doc. 85-3 at 40-41.*

42.    On March 15, 2017, Reed retuned to health services for follow up. Morehart ordered injections of diphenhydramine and ketorolac. *Doc. 85 at ¶47; Doc. 85-3 at 44-55.*

43.    On March 24, 2017, Reed was taken for an appointment with Dr. Allison Jones, a dermatologist practicing medicine in Memphis, Tennessee. According to Reed, Dr. Jones "properly diagnosed" his condition (eczematous dermatitis) and prescribed a treatment regimen of: Hibiclens, an over-the-counter

skin cleaning product; triamcinolone ointment; ketoconazole, an over-the-counter shampoo; and mupirocin ointment. She recommended a return visit in three months. *Doc. 2 at 19, 23; Doc. 85 at ¶48; Doc. 85-3 at 57-65.*

44.    On April 7, 2017, Reed saw Defendant Harris in health services. Reed indicated he was not getting the medications recommended by Dr. Jones. Dr. Capps reviewed and cosigned this encounter. *Doc. 85 at ¶49; Doc. 85-3 at 68-70.*

45.    On April 26, 2017, Morehart noted the prescriptions Dr. Jones had recommended were denied. Morehart reordered the prescriptions and requested a second review of etiology. *Doc. 85 at ¶50; Doc. 85-3 at 73-75.*

46.    On May 3, 2017, Morehart noted the prescriptions Dr. Jones had recommended were denied a second time. Morehart requested follow up with teledermatology to make them aware of Reed's current condition and the recommendations from the outside dermatologist. *Doc. 85-3 at 77-78.*

47.    On June 7, 2017, after a telehealth consultation, Dr. Hardin supported Dr. Jones' recommendation for Hibiclens and noted he would also consider a systematic immunosuppressant due to the large area of treatment with topical steroids. Morehart noted the prescriptions Dr. Jones had recommended were denied. Morehart reordered the prescriptions and requested a second review of etiology. *Doc. 85 at ¶51; Doc. 85-3 at 80.*

48.     The next day, Morehart noted the prescription approval by Dr. Hardin and ordered Hibiclens. Morehart also requested a follow up with Dr. Jones to explore options for systematic immunosuppressant. *Doc. 85 at ¶52; Doc. 85-3 at 83-85.*

49.     On June 14, 2017, Morehart saw Reed and noted his rash appeared significantly improved with Hibiclens. Morehart also renewed Reed's doxepin. On July 7, 2017, Morehart renewed the Hibiclens prescription. *Doc. 85 at ¶53; Doc. 85-3 at 87-97.*

50.     On June 25, 2017, Dr. Woodard ordered renewal of Doxepin to treat Reed's dermatitis. *Doc. 83 at ¶9.*

51.     On July 19, 2017, Reed filed an Informal Resolution Attempt complaining that he was being denied "everything the [outside specialist] ordered," his skin condition was getting worse, and he had "sores all over [his] body." *Doc. 2 at 90.*

52.     On July 19, 2017, Reed also sent an e-mail to Defendant Hoy, the FCI-FC Health Services Administrator ("HSA"), advising her he was not receiving the products prescribed by Dr. Jones and asking if a follow-up appointment with Dr. Jones had been made. *Doc. 2 at 91.*

53.     On July 31, 2017, Reed saw Morehart and complained his rash had spread to his throat and right eye. Morehart noted Reed had "diffuse rash with crusty lesions with excoriated centers to the lesions over most of his body," including a

"crusty patch" under his right eye. Morehart made an urgent request for a dermatology consultation the following day. *Doc. 2 at 19-20, 23*; *Doc. 85 at ¶54; Doc. 85-3 at 100-103.*

54.    On August 4, 2017, Reed received a response to his Informal Resolution. The response stated that his primary care provider in FCI-FC had been notified about "dermatologist follow-up" and he should "follow up in sick call until [he was] scheduled [for] the dermatologist." *Doc. 2 at 90.*

55.    On August 9, 2017, Reed filed a formal Request for Administrative Remedy, saying he was "still suffering" and "not getting the proper medical attention." *Doc. 2 at 92.*

56.    On August 22, 2017, Morehart noted Reed needed more betamethasone cream. Reed had possible reversible HPA axis suppression, manifestations of Cushing's syndrome, hyperglycemia, and glucosuria due to prolonged use of steroid cream. Morehart noted Reed had two dermatology consult requests pending. Morehart would request lab and review with dermatology before increasing Reed's dose of betamethasone. *Doc. 85 at ¶55; Doc. 85-3 at 106.*

57.    On September 7, 2017, Defendant Robinson, the FCI-FC Acting Assistant Warden, responded to Reed's formal Request for Administrative Remedy on behalf of Defendant Warden Beasley:

19

For relief, you are requesting to be evaluated for your skin condition.

A review of your medical record indicates a consultation has been submitted for you to be evaluated by an outside dermatologist.

Your medical record also indicates you are currently prescribed Betamethasone for your skin condition. The prescription indicates you have four refills on this medication.

The Health Services Administration encourages you to follow up in sick call as needed and adhere to the medication regimen currently prescribed by the clinician.

*Id. at 93.*

58.     On September 8, 2017, Reed saw Defendant Hickerson with a "bump" on his right eye with pain. After consulting with Dr. Woodard, Hickerson requested an emergency ophthalmology consultation. Dr. Woodard advised that, if Reed could not be seen by the ophthalmologist "this AM," then Reed needed to go straight to the emergency room. *Doc. 83 at ¶10; Doc. 85 at ¶56; Doc. 85-4 at 2-5.*

59.     Pursuant to the Hickerson's orders, Reed was taken to the hospital in West Memphis that day, where an ophthalmologist surgically lanced and drained fluid from Reed's eye and prescribed sulfa-based eye drops. Because Reed had an allergy to sulfa, alternative eye drops were provided. *Doc. 2 at 13, 20, 24; Doc. 85 at ¶56; Doc. 85-4 at 7-11.*

60.     On September 12, 2017, Reed filed a Regional Administrative Remedy Appeal, asserting that the rash had spread to his "entire body," the "in-house"

treatment and medications were ineffective, and he needed "proper medical care immediately," as well as "remov[al] of scars." *Doc. 2 at 94.*

61.    On September 20, 2017, Dr. Hardin evaluated Reed and again assessed eczematous dermatitis. Dr. Hardin recommended repeat culture of any purulent lesions, treatment with Bactrim, two showers a day with chlorhexidine wash, specific lotion application, topical betamethasone for lesions, and strict avoidance of irritants. Dr. Hardin recommended follow up with Dr. Jones for further assessment of immunosuppressants if the treatment regimen did not improve Reed's condition. *Doc. 85 at ¶¶57-58; Doc. 85-4 at 15.*

62.    Morehart switched the prescribed Bactrim to doxycycline due to Reed's sulfa allergy. She renewed Hibiclens. She also noted Reed had an outside dermatoloty appointment scheduled but she wanted to arrange an earlier appointment. *Doc. 85 at ¶58-59; Doc. 85-4 at 18-26.*

63.    On October 5, 2017, Dr. Woodard reviewed and co-signed an order for renewal of Doxepin to treat Reed's dermatitis. *Doc. 83 at ¶11.*

64.    The same day, on October 5, 2017, Defendant Caraway, the BOP Regional Director, responded to Reed's Regional Administrative Remedy Appeal. After reviewing Reed's electronic medical records, Caraway stated:

> Documentation reveals you have been evaluated by your local providers and have also been evaluated by the outside dermatology specialist on March 24, 2017, and evaluated by the BOP dermatologist on March 9, 2017, and on September 20, 2017. Documentation reveals

you have had modifications to your plan of care implemented which included laboratory examinations and multiple pharmacologic modifications implemented.

A review of your clinical encounters completed on September 20, 2017, and on September 21, 2017, indicates you reported no change in your skin conditions. However, on October 2, 2017, it was noted you were experiencing significant results with the use of the Chlorhexidine Gluconate liquid solution. A review of your Medication Summary reveals you are currently prescribed Betamethasone ointment, Chlorhexidine Gluconate liquid solution, and Doxycycline for the management of your skin conditions. You are currently scheduled for your follow up outside dermatology consultation. During your dermatology consultation, the specialist will make recommendations for the continued management of your skin conditions and your local providers will review the specialist's recommendations and modify your plan of care as clinically indicated.

In closing, documentation does indicate your local providers, in conjunction with the dermatology specialists, have been evaluating and managing your skin conditions. Health Services will continue to monitor your skin conditions. However, if your skin conditions worsen, you are encouraged to use the sick call process.

*Doc. 2. at 95-96.*

65.    On October 11, 2017, Morehart saw Reed for follow up and Reed indicated his rashes were a little better. *Doc. 85 at ¶61; Doc. 85-4 at 28-29.*

66.    On October 13, 2017, Hickerson approved restarting Reed's eye drops because the rash began returning around his eyes. *Doc. 85 at ¶62; Doc. 85-4 at 31-32.*

67.    On October 20, 2017, Morehart approved restarting Reed's nighttime doxepin for itching. He still had his morning prescription. *Doc. 85 at ¶63; Doc. 85-4 at 34-35.*

68.    On October 23, 2017, Dr. Obi-Okoye reviewed and co-signed an order for renewal of Doxepin to treat Reed's dermatitis. *Doc. 83 at ¶12.*

69.    On October 26, 2017, Reed filed a Central Office Administrative Remedy Appeal, claiming he still needed "proper medical care" and "remov[al of] the permanent scars covering [his] entire body." *Doc. 2 at 97-98.*

70.    On October 27, 2017, Reed saw outside dermatologist Dr. Jones, who noted the course of doxycycline decreased frequency of break outs. She also noted Reed was not provided with previously prescribed mupirocin and triamcinolone. Dr. Jones again prescribed Hibiclens, triamcinolone ointment, ketoconazole, and mupirocin ointment, and to follow up in six months. *Doc. 85 at ¶64; Doc. 85-4 at 37-41.* The recommended products were prescribed. *Doc. 2. at 99.*

71.    On November 1, 2017, Morehart noticed that Reed's rash was improved, but he did have scarring. She renewed Reed's medications and requested a psychology consultation. Dr. Woodard reviewed and co-signed the orders. *Doc. 85 at ¶65; Doc. 85-4 at 42-49.*

72.     On November 2, 2017, Morehart reviewed an outside dermatology consult and ordered the mupirocin prescription. Dr. Woodard reviewed and co-signed the orders. *Doc. 83 at ¶14; Doc. 85 at ¶66; Doc. 85-4 at 51-52.*

73.     On November 16, 2017, Dr. Woodard evaluated Reed at a chronic care visit; she changed his medications to see if the rash would improve. *Doc. 83 at ¶15.*

74.     On January 9, 2018, Dr. Woodard reviewed and co-signed an order for renewal of Doxepin to treat Reed's dermatitis. *Doc. 83 at ¶16.*

75.     On January 22, 2018, Reed saw Morehart and reported that his rash was worsening and he had pain around open sores. Morehart performed a punch biopsy and renewed Reed's medications. Morehart ordered clindamycin, rifampin, and renewed amitriptyline, betamethasone, and mupirocin. Dr. Woodard reviewed and co-signed the orders and reviewed the biopsy results. *Doc. 85 at ¶67; Doc. 85-4 at 54-59.*

76.     On February 8, 2018, Reed saw Morehart for a follow up. His rash improved some with clindamycin. Reed was awaiting approval for rifampin as an adjunct. Morehart reviewed the biopsy results with Reed (overlay of impetigo, a bacterial skin infection, secondary pruritic nodules) and renewed his antibiotics. Dr. Woodard reviewed and co-signed the orders. *Doc. 85 at ¶68; Doc. 85-4 at 61-66.*

77.     On February 26, 2018, Defendant Connors, the BOP National Inmate Appeals Administrator in Washington, D.C., responded to Reed's Central Office

Appeal, "concur[ring] with the manner in which the Warden and Regional Director responded to [his] concerns." Connors summarized the treatment Reed had received from Dr. Jones and the FCI-FC providers, specifically noting the Central Office approval of the non-formulary medication. He found "there was insufficient diagnostic data to make a clinical determination for the need for scar removal." Connors concluded that Reed had "received medical care and treatment in accordance with evidence based standard of care and within the scope of services of the Federal Bureau of Prisons." Finally, he encouraged Reed to "comply with proposed medical treatment so Health Services can continue to provide essential care and to contact medical personnel through routine sick call procedures should [his] condition change." *Doc. 2 at 99.*

78.    On April 17, 2018, Reed saw Morehart, who noted Reed's rash had been getting better, but was now getting worse, despite prolonged antibiotics. She ordered another dermatology appointment, and notified scheduling that Reed "really needs to go." In the interim, Morehart referred Reed to onsite doctor for evaluation and recommendation. Dr. Woodard reviewed and co-signed the orders. Reed was prescribed amitriptyline and his betamethasone and desonide cream were renewed. *Doc. 85 at ¶69; Doc. 85-4 at 68-72.*

79.    Reed saw Morehart on May 15, 2018, with worsening rash after a six month regimen of clindamycin and rifampin. The rash had underlying redness and

open wounds. Reed had an appointment with the outside dermatologist, Dr. Jones, in the near future. Morehart wanted to consider methotrexate therapy. *Doc. 85 at ¶70; Doc. 85-4 at 74-78.*

80. On May 22, and June 7, 2018, Reed went to health services for dressing changes and wound cleaning due to weeping leg wounds. He was given extra dressing supplies. *Doc. 85 at ¶71; Doc. 85-4 at 80-82.*

81. On May 24, 2018, Dr. Woodard reviewed and co-signed an order for renewal of Reed's chronic care medications. *Doc. 83 at ¶21.*

82. On June 11, 2018, Morehart saw Reed for ongoing chronic care and noted multiple dermatology consults were scheduled. *Doc. 85 at ¶72; Doc. 85-4 at 84-88.*

83. On June 19, 2018, Dr. Woodard evaluated Reed and noted his "SEVERE CASE of Dermatitis" that only resolved with antibiotics and skin creams. The plan was to get Reed to the outside dermatologist ASAP. Dr. Woodard renewed prescriptions for betamethasone, calcipotriene cream, Hibiclens, desonide cream, and clindamycin. *Doc. 85 at ¶73; Doc. 85-4 at 89-91.*

84. On June 26, 2018, Reed had his final appointment at the FCI-FC. Morehart examined Reed's open wound issue and consulted with BOP wound care for appropriate treatment. Morehart noted Reed had been treated with multiple oral antibiotics, antipruritic agents, topical creams, and high potency steroids. Reed was

at times noncompliant with treatment. His condition looked best after a six month course of clindamycin and rifampin, but as soon as the antibiotics were completed, the rash returned. Morehart noted underlying redness with pustules, thought to be staph, but more likely "exacerbated by chronic scratching and picking." Morehart noted redesignation was requested so Reed could move to a facility with "more readily available Dermatology services." *Doc. 85 at 74; Doc. 85-4 at 93-94.*

85.     On June 28, 2018, Reed transferred out of the FCI-FC. He arrived at FCI-Lexington on July 5, 2018. *Doc. 85 at ¶75.* Reed continued to receive medical care for his "ongoing" skin condition at the FCI-Lexington. *Doc. 49 at 5.*

86.     According to Reed, by "mid-2018," his condition was being kept "at bay" by his use of the products and treatment plan ordered by Dr. Jones. *Doc. 2 at 15.*

87.     During the time Reed received medical treatment at the FCI-FC, Defendant Hoy was either the HSA or the assistant HSA. *Doc. 85 at ¶76.*

88.     Dr. Maharaj A. Tomar is the Clinical Director and a Medical Officer at the FCI-FC. He has been Clinical Director since July 2020. As part of his official duties, Dr. Tomar has access to Reed's medical records. *Doc. 85 at ¶¶78-79.*

89.     Based on Dr. Tomar's review of Reed's medical records, it was Dr. Tomar's opinion, to a reasonable degree of medical certainty, that Reed received

timely and substantial healthcare while at the FCI-FC which met the community's standard of care for treatment. *Doc. 85 at ¶80.*

**B.    Reed's Bivens Claims Against Individual Defendants Manos, Dr. Obi-Okoye, Dr. Woodard, Harris, Hickerson, Morehart, and Hoy**

Reed has asserted individual capacity *Bivens* claims against Manos, Dr. Obi-Okoye, Dr. Woodard, Harris, Hickerson, and Morehart for providing him with inadequate medical care. In addition, Reed has asserted a *Bivens* claims for corrective inaction against Hoy.[10]

Under the 8th Amendment, Reed's inadequate medical care claims require him to prove that each of the Defendants was deliberately indifferent to his serious medical needs. "[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

Thus, Reed must establish that: (1) he had "objectively serious medical needs"; and (2) subjectively, each individual Defendant "actually knew of but deliberately disregarded those needs." *Hamner v. Burls*, 937 F.3d 1171, 1177 (8th Cir. 2019). The medical record makes it clear that Reed's chronic skin condition was

---

[10]The statute of limitations for a *Bivens* action is the forum state's statute of limitations for a personal injury claim, which in Arkansas is three years. *Sanchez v. United States*, 49 F.3d 1329, 1330 (8th Cir. 1995); *see Miller v. Norris,* 247 F.3d 736, 739 (8th Cir. 2001) (Arkansas). Accordingly, none of Reed's claims related to the medical care he received more than three years before he filed this case, on July 26, 2018, are actionable. *See Myers v. Vogal*, 960 F.2d 750, 751 (8th Cir. 1992).

an "objectively serious medical need." The problem for Reed is that the undisputed facts establish that none of the individual Defendants ever deliberately disregarded his medical needs.

Establishing that a prison official deliberately delayed or denied a prisoner's medical care is a high evidentiary bar to clear. It requires a prisoner to "show more than negligence, more even than gross negligence," to make out a constitutional violation. *Hamner*, 937 F.3d at 1177; *see Roberts v. Kopel*, 917 F.3d 1039, 1042 (8th Cir. 2019) (deliberate indifference requires a mental state "akin to criminal recklessness"). Significantly, prisoners "have no right to receive a particular or requested course of treatment," and prison medical personnel "remain free to exercise their independent medical judgment." *Barr v. Pearson*, 909 F.3d 919, 921 (8th Cir. 2018). A prisoner's "mere difference of opinion over matters of expert medical judgment or a course of medical treatment fails to rise to the level of a constitutional violation." *Id.* at 921-22 (citation and alterations omitted).

## 1. Reed's Inadequate Medical Care Claim Against Defendant Manos

Manos provided medical treatment to inmates at the FCI-FC in a *Locum Tenens* capacity. *Doc. 75 at 1.* On May 20, 2015, Manos reviewed Reed's medical records and saw him for the first time. A physical examination that day revealed Reed had a small open wound of the upper left armpit and several areas in various stages of healing. The wound was clear and dry with no signs of infection. *Doc. 85*

*at ¶13; Doc. 85-2 at 7-8.* Manos diagnosed temporary/acute hidradenitis. *Doc. 75 at 1.* He advised Reed to follow-up as needed and return immediately if his condition worsened. Manos prescribed Cephalexin 500 mg for seven (7) days. *Doc. 75 at 2.*

On June 17, 2015, Manos saw Reed again. During this visit, Reed complained of multiple skin "sores." He reported have problems with intermittent rashes on his legs and trunk for many years, and state that, in the past, he was prescribed "hydrocortisone 10" and betamethasone. *Doc. 75 at 2.* Manos performed a physical examination and noted Reed had various plaques to his chest, trunk, and legs at varying stages of healing. Some plaques had overlying excretions with surrounding erythema, some were hyperpigmented without erythema. *Doc. 75 at 2.* Manos diagnosed Reed with chronic and recurring dermatitis/eczema, proscribed triamcinolone for fourteen days and betamethasone for thirty days, instructed Reed to return to Sick Call/Triage if his condition did not improve, and advised Reed to follow up with teledermatology in six weeks for further treatment. *Doc. 75 at 2-3; Doc. 85-2 at 11-13.*

These were the only two occasions that Manos saw Reed and provided medical care. The medical records show that Manos properly evaluated Reed's chronic skin condition, provided medication, and advised him to seek additional treatment if it did not improve.

These undisputed facts make it impossible for Reed to plausibly argue that Manos deliberately disregarded Reed's serious medical needs, or otherwise provided him with inadequate medical care. Accordingly, the Court recommends that Manos' Motion for Summary Judgment (*Doc. 76*) be GRANTED, and Reed's deliberate indifference claims against him be DISMISSED, with prejudice.

### 2. Reed's Inadequate Medical Care Claims Against Defendants Dr. Obi-Okoye and Dr. Woodard

From 2013 until Reed's transfer in 2018, Dr. Obi-Okoye and Dr. Woodard treated Reed, reviewed records from other providers, and issued or approved prescriptions for his skin condition. The undisputed facts establish that neither Dr. Obi-Okoye nor Dr. Woodard were ever deliberately indifferent to Reed's serious medical needs, or otherwise provided him with inadequate medical care.

### a. Dr. Obi-Okoye

On October 30, 2013, Dr. Obi-Okoye saw Reed for his 14 day post-intake medical evaluation. The evaluation focused on Reed's sleep apnea and obesity. *Doc. 83 at ¶4.* On December 2, 2014, Dr. Obi-Okoye evaluated Reed during a Chronic Care visit. Dr. Obi-Okoye reviewed Reed's lab results and medications and renewed his medication orders, including an order for Nystatin cream to treat a foot rash. *Doc. 83 at ¶5; Doc. 85-1 at 79.* On December 8, 2014, Dr. Obi-Okoye discontinued nystatin cream and ordered clotrimazole cream for Reed's rash. *Doc. 83 at ¶6; Doc. 85-1 at 79.*

31

Dr. Obi-Okoye did not participate in Reed's care again until October 23, 2017, when he reviewed and co-signed an order for renewal of Doxepin to treat Reed's dermatitis. *Doc. 83 at ¶12.* Nothing about these undisputed facts suggests that Dr. Obi-Okoye was ever deliberately indifferent to Reed's serious medical needs.

### b. Dr. Woodard

Dr. Woodard had significantly more involvement in Reed's care than Dr. Obi-Okoye. However, the undisputed facts establish that Dr. Woodard provided appropriate medical care for Reed, reviewed records from other providers, approved or issued prescriptions, and never did anything suggesting she was being deliberately indifferent to his serious medical needs.

On June 29, 2016, Dr. Woodard reviewed and co-signed orders and biopsy results which indicated psoriasiform dermatitis, "most consistent with chronic eczematous dermatitis." *Doc. 83 at ¶8; Doc. 85 at ¶28; Doc. 85-2 at 91.*

On September 8, 2017, Reed saw Hickerson with a "bump" on his right eye with pain. Reed urgently needed care. Hickerson consulted with Dr. Woodard and requested an emergency ophthalmology consultation. Dr. Woodard advised that if Reed could not be seen by the ophthalmologist "this AM," then Reed needed to go straight to the emergency room. *Doc. 83 at ¶10; Doc. 85 at ¶56; Doc. 85-4 at 2-5.* Reed was taken to the hospital that day, where an ophthalmologist surgically lanced

and drained fluid from Reed's eye and prescribed eye drops. *Doc. 2 at 13, 20, 24; Doc. 85 at ¶56; Doc. 85-4 at 7-11.*

Dr. Woodard reviewed and co-signed orders for care, prescription medication, and consultations on November 1 and 2, 2017. *Doc. 83 at ¶14; Doc. 85 at ¶¶65-66; Doc. 85-4 at 42-52.* On November 16, 2017, Dr. Woodard evaluated Reed at a chronic care visit and changed his medications to see if the rash would improve. *Doc. 83 at ¶15.*

On January 9 and February 8, 2018, Dr. Woodard reviewed and co-signed treatment orders and prescriptions, and noted that Reed's rash had improved some with clindamycin, but he was awaiting approval for rifampin as an adjunct. *Doc. 83 at ¶16.*

On April 17, 2018, Reed saw Morehart, who noted Reed's rash had been getting better, but was now getting worse, despite prolonged antibiotics. She ordered another dermatology appointment, and notified scheduling that Reed "really needs to go [for outside consultation]." In the interim, Morehart referred Reed to Dr. Woodard, who reviewed and co-signed Morehart's orders. Reed was prescribed amitriptyline and his betamethasone and desonide cream were renewed. *Doc. 83 at ¶21. Doc. 85 at ¶69; Doc. 85-4 at 68-72.*

On June 19, 2018, Dr. Woodard evaluated Reed and noted his "SEVERE CASE of Dermatitis" that only resolved with antibiotics and skin creams. The plan

was to get Reed to the outside dermatologist ASAP. Dr. Woodard renewed prescriptions for betamethasone, calcipotriene cream, Hibiclens, desonide cream, and clindamycin. *Doc. 85 at ¶73; Doc. 85-4 at 89-91.*

The record establishes Dr. Woodward's consistent, long-term treatment of Reed's persistent skin problem offered temporary, and, in some instances, limited relief. Ultimately, Reed's need for care exceeded the staff's capabilities at FCI-FC, and he was referred to an outside dermatologist. The undisputed facts establish that Dr. Obi-Okoye and Dr. Woodard provided Reed with constitutionally adequate medical care and that neither of those physicians were ever deliberately indifferent to Reed's serious medical needs.

Accordingly, the Court recommends that Dr. Obi-Okoye and Dr. Woodard's Motion for Summary Judgment (*Doc. 79*) be GRANTED, and Reed's deliberate indifference claims against them be DISMISSED, with prejudice.

### 3.   BOP Defendants Harris, Hickerson, and Morehart

Defendants Harris, Hickerson and Morehart were all nurses who provided care to Reed. Morehart was significantly involved with Reed's care, while Harris and Hickerson saw Reed only a few times.

### a.  Defendant Harris

On April 7, 2017, Reed saw Harris in health services and told her he was not getting the medications recommended by Dr. Jones, an outside dermatologist. Reed

also indicated the only treatment that worked was betamethasone. *Doc. 85 at ¶49; Doc. 85-3 at 68-70.* Harris renewed Reed's betamethasone and ordered antibiotics. *Id.*

This appears to be the only time Harris directly treated Reed. Dr. Jones had prescribed a steroid cream, antibacterial ointment, an over-the-counter soap (Hibiclens), and an over-the-counter shampoo (ketoconazole). Harris provided a different steroid cream and ordered antibiotics. Reed had been previously provided with the recommended ketoconazole shampoo, but it had no effect. *Doc. 85 at ¶16; Doc. 85-2 at 21-22.* Reed had previously used triamcinolone ointment (recommended by Dr. Jones), but at times reported betamethasone (renewed by Harris) was the only thing that helped. *Doc. 85-2 at 21-22.*

At the next few medical visits, Morehart noted that the prescriptions recommended by Dr. Jones had not been authorized by other BOP medical providers. Nevertheless, Morehart reordered them. *Doc. 85 at ¶50; Doc. 85-3 at 73-75; 77-78.* After a telehealth consultation, the BOP dermatologist, Dr. Hardin, approved Dr. Jones' recommendation for Hibiclens. *Doc. 85 at ¶51; Doc. 85-3 at 80.*

Harris had no authority to override the decision of other BOP medical providers who did not authorize some of the medication prescribed by Dr. Jones, Importantly, Reed eventually received all of the specific medications prescribed by

Dr. Jones. In the meantime, he was still being treated with other similar prescription medications. These undisputed facts establish that Harris provided Reed with adequate and consistent medical care and was never deliberately indifferent to his serious medical needs.

### b. Defendant Hickerson

On September 8, 2017, Reed saw Hickerson with a serious eye condition. Hickerson consulted with Dr. Woodard and requested an emergency ophthalmology consultation. *Doc. 85 at ¶56; Doc. 85-4 at 2-5.* Pursuant to Hickerson's orders, Reed was taken to the hospital that day, where an ophthalmologist surgically lanced and drained fluid from Reed's eye and prescribed eye drops. *Doc. 2 at 13, 20, 24; Doc. 85 at ¶56; Doc. 85-4 at 7-11.* On October 13, 2017, Hickerson approved restarting Reed's eye drops because the rash began returning around his eyes. *Doc. 85 at ¶62; Doc. 85-4 at 31-32.*

This is the extent of Hickerson's direct treatment of Reed. These undisputed facts make it clear that Hickerson provided Reed with adequate medical care and was never deliberately indifferent to his serious medical needs.

### c. Defendant Morehart

Morehart began treating Reed for chronic eczema on December 2, 2015. At that time, she advised Reed that his rash, which had waxed and wanted for years,

would likely never completely resolve and would require intermittent treatment for the foreseeable future. *Doc. 85 at ¶20; Doc. 85-2 at 36-39.*

Morehart continued to treat Reed throughout his time at FCI-FC. Over the years, she submitted dermatology consultation requests, prescribed numerous medications, and ordered injections. Reed requested additional referrals when treatment did not work, and Morehart always supported those requests. *Doc. 85 at ¶27; Doc. 85-2 at 70-79.*

On July 11, 2016, Reed saw Morehart for sick call with severe rash on all extremities and torso. Morehart ordered re-consultation with BOP teledermatology, prescribed betamethasone cream, and ordered injections of Kenalog and Benadryl IM "now." *Doc. 85 at ¶27; Doc. 85-2 at 94-98.*

On April 26, 2017, Morehart noted the prescriptions Dr. Jones recommended had not been authorized. Morehart reordered the prescriptions and requested a review of etiology. *Doc. 85 at ¶50; Doc. 85-3 at 73-75.* On May 3, 2017, Morehart noted the prescriptions Dr. Jones had recommended were denied a second time. Morehart requested follow up with teledermatology to make them aware of Reed's current condition and the prescriptions issued by Dr. Jones, which other BOP staff denied in favor of giving Reed similar substitute medications. *Doc. 85-3 at 77-78.*

On June 7, 2017, after a teledermatology consultation with Dr. Hardin, Morehart noted the prescriptions Dr. Jones had recommended were again denied.

Morant reordered the prescriptions and requested a second review of etiology. *Doc. 85 at ¶51; Doc. 85-3 at 80.* These undisputed facts make it clear Morehart was doing everything she could do to get Reed the medications that were prescribed by Dr. Jones.

On July 31, 2017, Morehart made an urgent request for a dermatology consultation due to Reed's condition. *Doc. 2 at 19-20, 23*; *Doc. 85 at ¶54; Doc. 85-3 at 100-103.* On November 2, 2017, Morehart reviewed an outside dermatology consult and ordered the mupirocin prescription. *Doc. 85 at ¶66; Doc. 85-4 at 51-52.*

On April 17, 2018, Morehart noted Reed's rash was getting worse despite prolonged antibiotics. She ordered another dermatology appointment, and notified scheduling that Reed "really needs to go." In the interim, Morehart referred Reed to onsite doctor for evaluation and recommendation. *Doc. 85 at ¶69; Doc. 85-4 at 68-72.*

On May 15, 2018, Morehart noted Reed's rash was worsening even after a six month regimen of clindamycin and rifampin. She noted that Reed had an appointment with the outside dermatologist, Dr. Jones, in the near future. Morehart wanted Dr. Jones to consider methotrexate therapy. *Doc. 85 at ¶70; Doc. 85-4 at 74-78.*

The record establishes that Morehart repeatedly treated Reed with multiple oral antibiotics, antipruritic agents, topical creams, and high potency steroids. Reed

was at times noncompliant with treatment. His condition looked best after a six month course of clindamycin and rifampin, but as soon as the antibiotics were completed, the rash returned. Morehart noted redesignation was requested so Reed could move to a facility with "more readily available Dermatology services." *Doc. 85 at 74; Doc. 85-4 at 93-94.*

Morehart ordered numerous antibiotics and steroid creams for Reed, she requested numerous teledermatology and outsider dermatology appointments, she requested medications that were not previously provided, she took lab cultures and biopsies, and she referred Reed for urgent treatment when necessary.

The foregoing undisputed facts make it clear that Morehart was never deliberately indifferent to Reed's serious medical needs and that she consistently used her best efforts to ensure Reed received adequate medical care for his chronic skin condition.

### 4. BOP Defendant Hoy

Hoy was the HAS responsible for overseeing FCI-FC health services. Reed alleges that, on July 19, 2017, he sent Hoy an e-mail advising her he was not receiving the medication and products prescribed by Dr. Jones. He also asked Hoy if a follow-up appointment with Dr. Jones had been made.

Reed also alleges that he had several "face-to-face, personal conversations" with Hoy at FCI-FC about his medical concerns, but that she always "blew him off."

*Doc. 2 at 53, 91.* Based on these bare allegations, Reed claims that Hoy is liable for "corrective inaction" in failing to get him the medical care he required.

To the contrary, the undisputed facts establish that, while Reed was an inmate at FCI-FC, he received consistent, long-term care for his medical problems. To counter this evidence and maintain a claim against Hoy, Reed must show Hoy "knew that [Reed's] serious medical needs were not being adequately treated yet remained indifferent." *Langford v. Norris,* 614 F.3d 445, 460-461 (8th Cir. 2010). *Langford,* 614 F.3d at 460-61; *Schaub,* 638 F.3d at 918-20.

According to Reed, Hoy failed to take proper corrective action after reading Reed's e-mail and personally discussing his medical concerns. At most, the medical records indicate several delays in getting Reed the specific medication or products prescribed by Dr. Jones. It appears, at one point, that Dr. Jones, Morehart, and Dr. Hardin disagreed about the best treatment regimen for Reed's skin condition. The record establishes, however, that they all recognized Reed's serious need for medical treatment, and acted accordingly by prescribing various oral antibiotics, antipruritic agents, topical creams, high potency steroids, BOP teledermatology consults, and scheduling outside dermatology specialty consults. And when it was clear Reed's level of care required his transfer to a BOP facility better equipped to treat his skin condition, he was reclassified and sent to BOP Lexington, Kentucky, where there

were "more readily available Dermatology services." *Doc. 85 at 74; Doc. 85-4 at 93-94.*

The undisputed facts and medical records establish that Hoy was never deliberately indifferent to Reed's serious medical needs, or otherwise ever did anything that might constitute "corrective inaction." *Roberts v. Kopel*, 917 F.3d 1039, 1042 (8th Cir. 2019) (deliberate indifference requires a mental state "akin to criminal recklessness").

While there was a two or three month delay in Reed receiving Hibiclens, an antibacterial soap prescribed by Dr. Jones, neither Hoy nor any of the other Defendants caused that short delay. *Doc. 85-3 at 57-65; 87-97.* In fact, every medication or product that Dr. Jones recommended ultimately was prescribed or obtained. Finally, the delay in Reed receiving the antibacterial soap recommended by Dr. Jones appears to have been based on a good faith disagreement among doctors over the best way to treat Reed's complex and decades old skin problems. Nothing about that delay suggests Hoy did anything that comes close to "corrective inaction." *Allard v. Baldwin*, 779 F.3d 768, 771-72 (8th Cir. 2015).

Finally, Dr. Tomar stated his opinion, to a reasonable degree of medical certainty, that Reed received timely, substantial, and appropriate health care while at FCI-FC which met the community's standard of care for health care treatment.

41

*Doc. 85-1 at 14*. His medical opinion is undisputed and consistent with the medical records.

Thus, the undisputed facts establish that Hoy was never deliberately indifferent to Reed's serious medical needs and did nothing that might rise to the level of her not taking the actions necessary to insure Reed received adequate medical care for his skin condition.

## C.     Reed's Racial Discrimination and Equal Protection Claims Under 42 U.S.C. §§ 1981, 1985, and 1986 and ACRA

Reed alleges that the individual Defendants denied him adequate medical care based on his race. He also alleges there is a "racially hostile climate" throughout the BOP, identifying the individuals responsible for creating this alleged climate.

The Court allowed these claims to proceed beyond the screening stages only because they might be actionable *if* Reed's inadequate medical care and corrective inaction claims were found to have merit. *Doc. 10 at 4, 8-10, 13.*

Based on the undisputed facts, and controlling case law, all of Reed's *Bivens* claims against the individual Defendants are without merit. Accordingly, his bare allegations that his race played a role in him receiving allegedly inadequate medical care have no basis in fact and fail to state a claim for relief. Accordingly, Reed's racial discrimination and equal protection claims, under ACRA and 42 U.S.C. §§ 1981, 1985 and 1986, should be DISMISSED, with prejudice.

### D.    Federal Tort Claims Act Claim

Under the FTCA, the United States may be held vicariously liable for negligent or otherwise wrongful acts committed by federal employees acting within the scope of their employment. *See* 28 U.S.C. §§ 1346, 2671-2680; *Dykstra v. U.S. Bureau of Prisons*, 140 F.3d 791, 795 (8th Cir. 1998). An FTCA claim cannot be brought against an individual federal employee. *Knowles v. United States*, 91 F.3d 1147, 1150 (8th Cir. 1996). The exclusive legal remedy available to a party who has been injured as a result of a tort committed by a federal employee is a claim against the United States itself, brought under the FTCA. *Id.* ("the injured person must sue the United States which is liable in its employee's stead"); *see* 28 U.S.C. § 1346(b)(1), § 2679.

FTCA claims are governed by the substantive law of the state where the act or omission occurred. *Day v. United States,* 865 F.3d 1082, 1086 (8th Cir. 2017). Here, Arkansas law requires Reed to support his medical negligence claim against the United States with expert medical testimony because his longstanding and complex skin condition is well beyond the jury's common knowledge. *Robbins v. Johnson*, 367 Ark. 506, 512, 241 S.W.3d 747, 751 (2006).

The record establishes FCI-FC officials consistently treated Reed's chronic skin condition. Providers tried numerous treatment options and combinations, including various, multiple oral antibiotics, antipruritic agents, topical creams, high

potency steroids, BOP teledermatology consults, and outside dermatology specialty consults. And, when it became clear that Reed's level of care exceeded Defendants' capacity, he was reclassified and transferred to another BOP facility.

When, like here, the undisputed facts and a physician affidavit establish that Reed received consistent and adequate care for his chronic skin condition from all of the Defendant medical providers, he cannot create a genuine issue of material fact on his FTCA claim by merely stating his subjective lay opinion that he did not receive constitutionally adequate medical care for his skin condition. *Dulany v. Carnahan*, 132 F.3d 1234, 1240 (8th Cir. 1997). Accordingly, the United States' Motion for Summary Judgment on Reed's FTCA claim (*Doc. 84*) should be GRANTED, and the United States be DISMISSED, with prejudice.

## III.   Conclusion

The undisputed facts establish that, as a matter of law, each of the named Defendants is entitled to summary judgment.

IT IS THEREFORE RECOMMENDED THAT:

1.     Manos' Amended Motion for Summary Judgment (*Doc. 76*) be GRANTED, and Reed's claims against him be DISMISSED, with prejudice.

2.     Dr. Obi-Okoye and Dr. Woodard's Motion for Summary Judgment (*Doc. 79*) be GRANTED, and Reed's claims against them be DISMISSED, with prejudice.

3.    The United States' and BOP Defendants' Motion for Summary Judgment (*Doc. 84*) be GRANTED, and Reed's claims against the United States, Harris, Hickerson, Morehart, and Hoy be DISMISSED, with prejudice.

4.    Reed's race and equal protection claims, which he has asserted against all Defendants under ACRA and 42 U.S.C. §§ 1981, 1985 and 1986, be DISMISSED, with prejudice.

5.    Reed's claims against "Dr. J. Capps," who he has failed to properly serve, be DISMISSED, without prejudice.

Dated this 18ᵀᴴ day of February, 2022.


_____
UNITED STATES MAGISTRATE JUDGE